# UNITED STATES DISTRICT COURT
# FOR EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Wazee Street Opportunities Fund IV LP, Douglas Whitley, and Lisa Brown, On Behalf of Themselves and All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE FEDERAL HOUSING FINANCE AGENCY; MELVIN L. WATT, in his official capacity as Director of the Federal Housing Finance Agency; and THE U.S. DEPARTMENT OF THE TREASURY,<br><br>Defendants. | Case No.<br><br><br><br>**COMPLAINT – CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

## **TABLE OF CONTENTS**

NATURE AND SUMMARY OF THE ACTION..........................................................................1

JURISDICTION AND VENUE..............................................................................................2

THE PARTIES ....................................................................................................................2

CONSTITUTIONAL PROVISIONS .......................................................................................2

FACTUAL ALLEGATIONS ..................................................................................................3

I.      FHFA PLACED FANNIE MAE AND FREDDIE MAC INTO CONSERVATORSHIP
        AND, IN CONJUNCTION WITH TREASURY, FORCED THEM INTO AN
        AGREEMENT THAT HARMS PLAINTIFFS. ................................................................3

        A.     Through 2008, Fannie Mae And Freddie Mac Were Financed By Private
               Investment.                                                                          3

        B.     In July 2008, Congress Created FHFA, Which In September 2008 Placed The
               Companies Into Conservatorship. ..............................................................4

        C.     In Exchange For Funding, FHFA Executed An Agreement Giving Treasury A 10%
               Senior Preferred Stock Dividend And Warrants To Buy 79.9% Of Each Company's
               Common Stock For A Nominal Price. ..........................................................8

        D.     At The Beginning Of 2012, The Housing Market Rebounded And The Companies
               Returned To Profitability. ........................................................................12

        E.     On August 17, 2012 The Government Imposed The Third Amendment, Giving
               Treasury A Right To A Quarterly Dividend Equal To 100% Of The Companies' Net
               Worth (Minus A Small Reserve That Was Set To Shrink To Zero In 2018). ...........13

        F.     In December 2017, Treasury And FHFA Again Confirmed That The Net Worth
               Sweep Must Ensure That 100% Of All Value In The Companies Must Go To
               Treasury, No Matter How Large That Value May Be. ...............................19

II.     THE THIRD AMENDMENT IS INVALID BECAUSE IT IS THE CONSEQUENCE OF
        DECISIONS AND ACTIONS MADE BY AN UNCONSTITUTIONALLY
        STRUCTURED AGENCY AND UNCONSTITUTIONALLY APPOINTED OFFICER.
        ..............................................................................................................20

        A.     The FHFA Is Unconstitutionally Structured...........................................21

        B.     HERA Provides No Intelligible Principle That Guides FHFA's Conservatorship
               Powers...................................................................................................22

        C.     The FHFA's Director Was Unconstitutionally Appointed And Remained So At The
               Time The Third Amendment Was Executed. ...........................................24

III.    CLASS ACTION ALLEGATIONS. ..............................................................................26

COUNT I ..........................................................................................................................28

COUNT II ............................................................................................................................30

COUNT III ...........................................................................................................................31

COUNT IV ...........................................................................................................................32

COUNT V .............................................................................................................................33

PRAYER FOR RELIEF .......................................................................................................35

Plaintiffs Wazee Street Opportunities Fund IV LP ("Wazee Street"), Douglas Whitley, and Lisa Brown (collectively, "Plaintiffs") submit this Class Action Complaint against the United States of America.

## NATURE AND SUMMARY OF THE ACTION

1. This is a class action brought by Plaintiffs on behalf of themselves and classes (the "Classes," as defined herein) of owners of Common Stock issued by the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie;" Fannie Mae and Freddie Mac together, the "Companies"). Since September 2008, when the Federal Housing Finance Agency ("FHFA") exercised its regulatory authority to force Fannie and Freddie into conservatorship, FHFA has wielded plenary control over the Companies' operations. Plaintiffs and the Classes (together, the "Plaintiffs") bring this suit to challenge the constitutionality of FHFA and its actions related to and following from the execution and implementation of the Third Amendment to the Senior Preferred Stock Purchase Agreement, dated August 17, 2012 (the "Third Amendment") by the United States of America, including FHFA and the Department of the Treasury ("Treasury").

2. Since its inception, FHFA is and has been unconstitutional in structure and function, and its actions were and are unconstitutional in multiple ways. Specifically, it is unconstitutionally structured as an independent agency that has a single director that can be removed only for cause and is insulated from executive, legislative, and judicial oversight to an extent that violates the Constitution's separation of powers. Moreover, at the time of the Third Amendment, FHFA was headed by an unconstitutionally appointed Director that was an "acting" official for multiple years, in contravention to the Appointments Clause. And in executing its authority as conservator, it was acting pursuant to an unconstitutional delegation that lacks an intelligible principle to guide how the conservator is to exercise the powers given to it by Congress.

For each of these reasons, collectively and individually, FHFA acted unlawfully when it forced the Companies into the Third Amendment.

## JURISDICTION AND VENUE

3.      This action arises under the United States Constitution.  The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 2201.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(e)(1)(C) because this is an action against agencies of the United States and an officer of the United States in his official capacity, one of the Plaintiffs resides in this judicial district, and no real property is involved in the action.

## THE PARTIES

5.      Plaintiff Wazee Street is a Delaware limited partnership.  It owns 1,605,000 shares of Fannie Mae common stock that it acquired between December 2016 and November 2017. Wazee Street is managed by Wazee Street Capital Management LLC, a Colorado limited liability company.

6.      Plaintiff Douglas Whitley is a resident of North Carolina.  He owns 196 shares of Fannie Mae common stock that he acquired in September 2008.

7.      Plaintiff Lisa Brown is a resident of Pennsylvania and has owned 11.6568 shares of Freddie common stock since at least 2014.

8.      Defendant United States of America includes Treasury, FHFA, and agents acting at their direction.

## CONSTITUTIONAL PROVISIONS

9.      Article II, Section 1 of the United States Constitution provides that "The executive Power shall be vested in a President of the United States."

2

10.     Article II, Section 2 provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States." Additionally, this provision states that "The President shall have Power to fill up all Vacancies that may happen during the Recess of the Senate, by granting Commissions which shall expire at the End of their next Session."

## FACTUAL ALLEGATIONS

### I.  FHFA PLACED FANNIE MAE AND FREDDIE MAC INTO CONSERVATORSHIP AND, IN CONJUNCTION WITH TREASURY, FORCED THEM INTO AN AGREEMENT THAT HARMS PLAINTIFFS.

### A.  Through 2008, Fannie Mae And Freddie Mac Were Financed By Private Investment.

11.     Fannie Mae and Freddie Mac are stockholder-owned corporations. Fannie Mae was established in 1938 to provide the mortgage market with supplemental liquidity, and was converted to a private corporation in 1968. Freddie Mac was created in 1970 as an alternative to Fannie Mae to make the secondary mortgage market more competitive and efficient. Both Companies are sometimes referred to as "Government Sponsored Enterprises" (or "GSEs"), which reflects the fact that they are private corporations created by Congress to increase mortgage market liquidity. They purchase mortgages originated by private banks and bundle them into mortgage-related securities to be sold to investors. By creating this secondary mortgage market, the Companies increase liquidity for private banks, which enables them to make additional loans to individuals for home purchases.

12.     Notwithstanding that they were created by federal statute, until September 2008, Fannie Mae and Freddie Mac were financed by private investment. The Companies actively marketed their securities to a wide variety of investors – including through 2008. For instance, they had a variety of programs to encourage their midlevel employees to buy Company stock. *See*

3

*Worker Assets Shrink at Fannie and Freddie,* N.Y. TIMES (Aug. 28, 2008). In May 2008, Fannie

Mae produced a "Capital Raise Roadshow" presentation in which the company touted its "[l]ong-

term growth and profitability prospects" and the "[c]ompelling investment opportunities in current

environment." The "rationale" was to "[e]nhance long-term shareholder value" and the

presentation noted that the "[m]ix of the offering maintains an appropriate ratio of preferred to

common equity in our capital structure . . . ."

13.     Prior to 2007, Fannie and Freddie were consistently profitable. In fact,

Fannie had not reported a full-year loss since 1985 and Freddie had not reported a full-year loss

since becoming owned by private shareholders in 1989.

**B.     In July 2008, Congress Created FHFA, Which In September 2008 Placed The Companies Into Conservatorship.**

14.     From 1992 until 2008, the Office of Federal Housing Enterprise Oversight

(the "OFHEO") was the Companies' primary regulator. In July 2008, in response to the crisis in

the housing and mortgage markets, Congress enacted the Housing and Economic Recovery Act of

2008 ("HERA"). That Act established FHFA to replace the OFHEO as the Companies' regulator,

and granted Treasury temporary authority to assist the Companies through the purchase of

securities.

15.     Unlike OFHEO, FHFA is a so-called "independent agency." FHFA is

headed by a Director who is removable from office by the President only "for cause." 12 U.S.C.

§ 4512(b)(2). HERA further provides that when FHFA acts as conservator, it "shall not be subject

to the direction or supervision of any other agency of the United States," *id.* § 4617(a)(7), and that

FHFA is to be funded through assessments that are "not . . . construed to be Government or public

funds or appropriated money," *id.* § 4516(f)(2). And unlike virtually all other so-called

"independent agencies" established by Congress, FHFA was and is subject to the control of only

4

a single individual – the FHFA Director.  FHFA therefore is neither subject to presidential control nor constrained by the congressional appropriations process, which violates Article II, Sections 1 and 2 of the United States Constitution.

16.    On September 6, 2008, FHFA placed the Companies into conservatorship.

17.    FHFA's decision to place the Companies into conservatorship was based primarily on a political judgment, rather than an analysis of the HERA statutory factors.  As the *New York Times* reported, the administration sought "to shrink drastically [Fannie Mae and Freddie Mac's] outsize influence on Wall Street and on Capitol Hill while at the same time counting on them to pull the nation out of its worst housing crisis in decades." *In Rescue To Stabilize Lending, U.S. Takes Over Mortgage Finance Titans*, N.Y. TIMES (Sept. 7, 2008).    And "In the end, [Treasury Secretary] Paulson's decision seems to have been a philosophical one, rather than one forced by imminent crisis.  Of course, for stagecraft purposes, it was played as impending disaster." *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES (Sept. 9, 2008).

18.    Indeed, prior to placing the Companies into conservatorship, key leaders repeatedly reassured the public, including the Companies' private investors, that neither Company was approaching insolvency or operating unsafely.  Rather, they explained, the goal of the legislation was to provide confidence to the housing market.  For instance, while HERA was under consideration, both Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben Bernanke testified before the House Financial Services committee that Fannie Mae and Freddie Mac were adequately capitalized.    Similarly, while HERA was under consideration, the Companies' then-regulator, OFHEO, issued a statement that, as of 2008, Fannie Mae and Freddie Mac were "holding capital well in excess of the OFHEO-directed requirement[.]"  Similarly, in support of HERA, Senator Isakson (R-GA) commented that:

The bill we are doing tomorrow is not a bailout to Freddie Mac and Fannie Mae or the institutions that made bad loans. It is an infusion of confidence the financial markets need. Fannie and Freddie suffer by perception from the difficulties of our mortgage market. If anybody would take the time to go look at the default rates, for example, they would look at the loans Fannie Mae holds, and they are at 1.2 percent, well under what is considered a normal, good, healthy balance. The subprime market's defaults are in the 4 to 6 to 8-point range. That is causing the problem. That wasn't Fannie Mae paper, and it wasn't securitized by Fannie Mae. They have $50 billion in capital, when the requirement is to have $15 billion, so they are sound. But the financial markets, because of the collapse of the mortgage market, have gotten worse.

19.     As the Conservator, FHFA became responsible for "preserv[ing] and conserv[ing] [the Companies'] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D). At the time, FHFA stated that the goal of this action was "to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market." According to FHFA's press release, the conservatorship was "designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized." FHFA also issued a Fact Sheet indicating that, "[u]pon the [FHFA] Director's determination that the Conservator's plan to restore the Company to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship."

20.     FHFA took no action that modified or canceled any shareholder rights. Instead, it emphasized that they would retain their rights:

> (a)     FHFA's Director told investors that "the common and all preferred stocks will continue to remain outstanding." Statement of FHFA Director James B. Lockhart (Sept. 7, 2008) (available at goo.gl/xMjTse).

(b)     Treasury Secretary Paulson likewise made clear that, "conservatorship does not eliminate the outstanding preferred stock, but does place preferred shareholders second, after the common shareholders, in absorbing losses." Statement by Secretary Henry M. Paulson, Jr. (Sept. 7, 2008) (available at goo.gl/weFLds).

(c)     In a Form 8-K filing issued by Freddie Mac on September 11, 2008, Freddie Mac stated that, "The holders of Freddie Mac's existing common stock and preferred stock . . . will retain all their rights in the financial worth of those instruments, as such worth is determined by the market." (emphasis added).

(d)     In Fannie Mae's September 11, 2008 Form 8-K, it stated that "FHFA, as Conservator, has the power to repudiate contracts entered into by Fannie Mae prior to the appointment of FHFA as Conservator if FHFA determines, in its sole discretion, that performance of the contract is burdensome and that repudiation of the contract promotes the orderly administration of Fannie Mae's affairs. FHFA's right to repudiate any contract must be exercised within a reasonable period of time after its appointment as Conservator." This statement reflected what is expressly set forth in HERA regarding FHFA's power to repudiate contracts. Thus, if FHFA was to repudiate the contracts between the Companies and their shareholders, FHFA was required to do so "within a reasonable period of time after its appointment as conservator" on September 6, 2008. By regulation, FHFA determined that "a reasonable

7

period shall be defined as a period of 18 months following the appointment of a conservator." 12 C.F.R. § 1237.5.

**C.    In Exchange For Funding, FHFA Executed An Agreement Giving Treasury A 10% Senior Preferred Stock Dividend And Warrants To Buy 79.9% Of Each Company's Common Stock For A Nominal Price.**

21.    When the Companies were placed into conservatorship, Treasury entered into Preferred Stock Purchase Agreements ("PSPAs") with FHFA, which acted on behalf of both Companies.  The PSPAs for Fannie Mae and Freddie Mac are identical in all material respects. Through these agreements, Treasury agreed to make investments in the Companies in exchange for Senior Preferred Stock plus warrants to acquire common stock equal to 79.9% of the common stock in the Companies.  Under the instruments laying out the terms of the Senior Preferred Stock for each Company:

> (a)    Treasury was given the right to receive a senior preferred dividend each quarter in an amount equal (on an annual basis) to 10% of the outstanding principal value of the Senior Preferred Stock if the dividend was paid in cash;
>
> (b)    If a Company elected not to pay the dividend in cash, Treasury would receive a dividend in the form of additional Senior Preferred Stock with a face value equal to 12% of the outstanding principal value of the Senior Preferred Stock;
>
> (c)    The principal value of the Senior Preferred Stock in each Company would equal the amount invested by Treasury in each Company, plus $1 billion to reflect a commitment fee with respect to each Company (plus any stock dividends distributed based upon the 12% dividend right referenced above);

8

(d)    The Senior Preferred Stock ranked senior in priority to all other Fannie Mae and Freddie Mac Stock, so that no dividends or liquidation distributions could be paid to any other owner of stock in the Companies until after Treasury had received its dividend or liquidation distributions under its Senior Preferred Stock (the liquidation preference was equal to the principal value of the Senior Preferred Stock plus any unpaid dividends);

(e)    Treasury also received warrants to acquire 79.9% of the common stock of each Company for a nominal price; and

(f)    Treasury was also given the right to receive a quarterly periodic commitment fee, to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive the fee for up to a year at a time.

22.    The agreement did not nullify shareholder rights. Indeed, the foregoing terms, particularly those referring to priority over the rights of other (private) shareholders, would have been nonsensical if the rights of other shareholders had been nullified by the conservatorship. The PSPAs clearly contemplate that private shareholders retained their rights to dividends and liquidation distributions, albeit subject to the preferences given to the Treasury under the PSPAs.

23.    This can also be seen by looking at Treasury's statutory authority to purchase stock in the Companies, and statements made by the Treasury Secretary in connection with those purchases. In general, Treasury does not have the statutory authority to purchase corporate stock. However, HERA gave Treasury temporary authority to purchase securities issued by the Companies. *See* 12 U.S.C. §§ 1455(*l*), 1719(g). To exercise that authority, the Secretary

of the Treasury was required to determine that purchasing the Companies' securities was "necessary to . . . provide stability to the financial markets; . . . prevent disruptions in the availability of mortgage finance; and . . . protect the taxpayer." 12 U.S.C. §§ 1455(*l*)(1)(B), 1719(g)(1)(B). In making those determinations, the Secretary was required to consider six factors:

> (i) The need for preferences or priorities regarding payments to the Government.
> (ii) Limits on maturity or disposition of obligations or securities to be purchased.
> (iii) *The [Companies'] plan[s] for the orderly resumption of private market funding or capital market access*.
> (iv) The probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment.
> (v) *The need to maintain the [Companies'] status as . . . private shareholder-owned compan[ies]*.
> (vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(*l*)(1)(C), 1719(g)(1)(C) (emphasis added).

24.     In approving the exercise of Treasury's temporary authority under HERA to purchase securities of the Companies, Treasury Secretary Paulson determined (1) "[u]nder conservatorship, Fannie Mae and Freddie Mac will continue to operate as going concerns"; (2) "Fannie Mae and Freddie Mac may emerge from conservatorship to resume independent operations"; and (3) "[c]onservatorship **preserves the status and claims of the preferred and common shareholders**." Action Memorandum for Secretary Paulson (Sept. 7, 2008) (emphasis added). None of this would have made any sense if the conservatorship and original PSPAs were intended to nullify the rights of the Companies' private shareholders.

25.     After FHFA took control of the Companies, it claimed that it did not expect them to be profitable, and that they would likely incur large losses in the coming years. FHFA therefore directed the Companies to book substantial loss reserves—recording anticipated

mortgage loan losses before they were actually incurred—and required the Companies to eliminate from their balance sheets the value of deferred tax assets that would only be of use if the Companies became profitable (*i.e.*, generated positive taxable income).

26.     As the Government was well aware in 2008, these write-downs and accounting decisions led to the payment of some circular dividend payments.  To pay a quarterly dividend payment to Treasury, the FHFA caused the Companies to draw on Treasury's funding commitment.  This, in turn, increased the amount of stock held by Treasury, which further increased the amount of dividends the Companies were required to pay.

27.     Treasury's authority under HERA to purchase the Companies' securities expired on December 31, 2009.  *See* 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4). After that date, HERA authorized Treasury only "to hold, exercise any rights received in connection with, or sell" previously purchased securities.  *Id.* §§ 1455(*l*)(2)(D), 1719(g)(2)(D).

28.     During 2009, Treasury and FHFA amended the PSPAs twice.  First, in May 2009, Treasury agreed to expand its funding commitment to $200 billion per Company from $100 billion per Company.  Then, on December 24, 2009, it agreed to a funding commitment that would be sufficient to allow the Companies to satisfy their 2010, 2011, and 2012 capitalization requirements and a funding commitment up to a limit determined by an agreed-upon formula for subsequent years.

29.     Throughout this time, the Companies continued to be managed in conservatorship by FHFA.  HERA empowered FHFA to force the Companies into receivership and to liquidate their assets under certain circumstances, 12 U.S.C. § 4617(b)(2)(E), but FHFA always has maintained that its relationship with the Companies is that of Conservator rather than liquidator.  *See* News Release FHFA, *A Strategic Plan For Enterprise Conservatorships: The Next*

*Chapter In A Story That Needs An Ending*, at 9 (Feb. 21, 2012) (asserting that "[w]ithout action by Congress, FHFA must continue to look to the existing statutory provisions that guide the conservatorships"). FHFA has never stated that it was placing the Companies into receivership.

**D.     At The Beginning Of 2012, The Housing Market Rebounded And The Companies Returned To Profitability.**

30.     By the beginning of 2012, it became clear that the Government had (perhaps deliberately) overestimated the Companies' likely losses and underestimated the possibility of a return to profitability. Contrary to FHFA's 2008 projections, the Companies posted profits of more than $10 billion for the first two quarters of 2012. Even more importantly, the Companies disclosed that they expected to be consistently profitable for the foreseeable future, and that expectation of profitability meant that they would soon be able to reverse the valuation allowance against their deferred tax assets, worth approximately $100 billion. In addition, the Companies' actual loan losses were far less than anticipated. Between the beginning of 2007 and the second quarter of 2012, more than $234 billion had been set aside by the Companies to absorb anticipated loan losses, whereas loan losses of just over $125 billion were actually recognized during that period, such that the projected losses had been overestimated by $109 billion. The reversal of these excess reserves would lead to a substantial increase in profitability.

31.     By the beginning of 2012, the Companies, FHFA, and Treasury were very well aware that Fannie Mae and Freddie Mac were expected to be sufficiently profitable for years to come to pay the 10% dividend on the Senior Preferred Stock without the necessity of drawing from the Treasury.

32.     The Companies, FHFA, and Treasury were aware that, beginning in 2012, the Companies were forecast to be so consistently profitable that the Companies could afford to repay Treasury its initial investment within eight years.

33. In addition, as FHFA and Treasury were aware, the Companies had certain deferred tax credits that would further enhance their profitability in the very near term.

34. Thus, as of the first half of 2012, FHFA, Treasury, and the Companies all knew that the Companies were positioned to pay back the Government for the support they had received, with money left over to provide a financial return to their other stockholders.

**E.     On August 17, 2012 The Government Imposed The Third Amendment, Giving Treasury A Right To A Quarterly Dividend Equal To 100% Of The Companies' Net Worth (Minus A Small Reserve That Was Set To Shrink To Zero In 2018).**

35. With the Companies' return to consistent, and indeed record profitability, the private stockholders had reason to believe and expect that the Companies would soon become healthy enough to redeem the Senior Preferred Stock, exit conservatorship, and be "return[ed] to normal business operations," as FHFA's director had vowed when the conservatorship was established. Certainly, the holders of the Common Stock had reason to believe and expect that the economic value of their shares, and the rights they had as stockholders, would likely be increasing. They had no reason to believe those rights would be taken by the Government without just compensation.

36. But, rather than taking steps to enable the Companies to redeem the Senior Preferred Stock or at least to accumulate capital for the benefit of the Companies and their non-governmental shareholders, the Government took the unprecedented step of radically changing the deal FHFA and Treasury had originally made so as to seize 100% of all value the Companies could ever generate, and to eliminate any possibility that private shareholders would ever receive anything. On August 17, 2012, FHFA, purportedly acting as Conservator for the Companies, and the Treasury "agreed to" a so-called "Third Amendment" to the PSPAs. This Third Amendment was not really an "agreement" between two different entities negotiating at arm's length, but was instead a unilateral action by two government entities acting in concert. It provides that in place

13

of the 10% coupon due on Treasury's Senior Preferred Stock under the original PSPAs, the Treasury would now receive a dividend equal to *100% of the Companies' net worth* (minus a small reserve that was set to shrink to zero in 2018). And, since the PSPAs provided that in the event of a liquidation of Fannie Mae or Freddie Mac, the Government would receive a liquidation distribution that included an additional Net Worth Sweep dividend, the Third Amendment guaranteed that even if the Companies were liquidated, Treasury would receive *100% of their net worth* in that liquidation. No matter how much value the Companies generate, the Third Amendment provides that 100% of it has to go to the Treasury.

37.      Thus, the Third Amendment expropriated for the Government all of the economic rights held by the private shareholders of Fannie and Freddie. As Treasury stated on the day of the announcement, the Third Amendment was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers" – *i.e.,* not the private stockholders.

38.      Neither the Companies nor the stockholders received any meaningful consideration in exchange for the Third Amendment. Under the Third Amendment, the amount of cash the Companies transfer to Treasury as a dividend does not reduce the amount of the Senior Preferred Stock outstanding. Furthermore, the Companies have not been permitted to redeem Treasury's Senior Preferred Stock. Thus, regardless of how much money the Companies send to Treasury, all of the Senior Preferred Stock will remain outstanding, and Treasury will continue to take all of the Companies' net worth. The Third Amendment thus takes tens of billions of dollars of value (if not hundreds of billions) from the Companies' private shareholders and transfers that value to the federal government.

14

39.     The Government implemented the Third Amendment to promote the economic and political interests of one stockholder—the U.S. Treasury—at the expense of all others.  The Net Worth Sweep furthered the Government's goal of ensuring that all future profits be transferred to Treasury (sometimes referred to as "taxpayers"), and not to the private stockholders.  It also appears that the Third Amendment was designed to support the Treasury's political goal, at least as of 2012, of winding down the Companies (and winding them down in a way that captured 100% of the surplus value for the Treasury).

40.     At a dividend rate of 10%, Treasury's approximately $189 billion in outstanding Senior Preferred Stock (as of August 16, 2012) would have yielded annual dividends of some $18.9 billion, payable in quarterly installments of approximately $4.7 billion.  Thus, *but for the Third Amendment,* in any quarter in which the Companies' combined profits exceeded $4.7 billion (or more precisely, any quarter in which Fannie Mae or Freddie Mac's profits exceed the dividend owed on their Senior Preferred Stock), that excess value would inure to the benefit of the private stockholders.  As *Fortune* magazine reported:

> Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement?  By mid-2012, Fannie and Freddie were beginning to generate what would become gigantic earnings as the housing market rebounded.  If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone.  That would exert pressure for Congress to allow Fannie and Freddie to pay back the government in full, and reemerge as private players.  Timothy Geithner was strongly opposed to the rebirth of the old Fannie and Freddie.  The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

*What's Behind Perry Capital's Fannie and Freddie Gambit*, FORTUNE (July 8, 2013).

41.     In an August 17, 2012 press release announcing the Third Amendment, Treasury said that the changes would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and

support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market." It called the Third Amendment a full sweep of "**every dollar of profit that [the] firm earns going forward**," and that the amendment will fulfill the "commitment made in the Administration's 2011 White Paper that [Fannie Mae and Freddie Mac] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."

42.     This language was in stark contrast to the earlier public representations by Treasury and FHFA that they sought only to "stabilize" the Companies and return them "to normal business operations" (as well as DeMarco's February 2, 2010 statement that "[t]here are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing laws is to reconstitute the two companies under their current charters.")

43.     There can be no doubt about the intention behind the Third Amendment and its Net Worth Sweep: it was intended to give Treasury more money by ensuring that *all* the profits of the Companies would be swept to Treasury, not just the 10% dividend. Regardless of whether the Companies are actually wound down or not, that is both the clear effect of the Net Worth Sweep and its stated intent. It takes the economic rights held by private shareholders and transfers 100% of them to the Treasury.

44.     After the Net Worth Sweep was finalized, a senior White House advisor involved in the process wrote that Treasury was "ensuring that [the Companies] can't recapitalize" and "clos[ing] off [the] possibility that [Fannie and Freddie] ever[] go (pretend) private again." The same official wrote in another email that the Net Worth Sweep would ensure that the Companies "can't repay their debt and escape."

45.     The Government has received and will continue to receive a massive windfall pursuant to the terms of the Third Amendment.  As of the date of this filing, the Companies have paid approximately $280 billion in dividends to Treasury.  Of that amount, approximately $50 billion was paid before the Net Worth Sweep, and approximately $230 billion was paid after the Net Worth Sweep.  This is approximately $90 billion more than Treasury's total investment in the Companies.  Moreover, as of the date of this filing, the total amount of dividends paid under the Net Worth Sweep is roughly $125 billion more than Treasury would have received under the 10% dividend provided for in the original PSPAs.  Yet the principal value of Treasury's Senior Preferred Stock has not been reduced at all, and it continues to receive quarterly dividends equal to the net worth of the two Companies, minus a small capital reserve.

46.     The Third Amendment has even captured the Companies' recoveries on legal claims that preceded the conservatorships.  For example, on October 1, 2013, Freddie Mac announced that it had entered into a $1.3 billion settlement with three financial institutions concerning Freddie Mac's claims relating to representations and warranties on loans that it had purchased.  FHFA, as Freddie Mac's Conservator, had approved the settlement.  The claims at issue involved loans that Freddie Mac purchased between 2000 and 2012, most of which preceded the conservatorship by several years, yet none of the funds recouped will go to benefit Freddie Mac stockholders.  Rather, Freddie Mac's CEO stated that, "[w]ith these settlements, Freddie Mac is recouping funds effectively due to the nation's taxpayers."  On May 28, 2013, FHFA announced a $3.5 billion settlement of claims of alleged violations of federal and state securities laws in connection with private-label residential mortgage-backed securities purchased by Fannie Mae and Freddie Mac in the years prior to the conservatorships.  Similarly, on October 25, 2013, FHFA announced a $1.1 billion settlement with JP Morgan relating to claims based on loans sold to Fannie and Freddie in the years leading up to the financial crisis and a separate $4 billion settlement

17

with JP Morgan relating to claims for violations of federal securities laws in connection with the sales and securitizations of loans to the Companies from 2005 to 2007. In 2013 alone FHFA announced similar settlements with General Electric ($549 million), UBS ($885 million), Wells Fargo ($335 million), and Bank of America ($404 million), every penny of which went to Treasury. In 2014, FHFA announced settlements, in its role as Conservator to the Companies, totaling approximately $9.7 billion with Bank of America ($9.33 billion aggregate payment), Barclays Bank PLC ($280 million) and RBS Securities ($99.5 million) which cover private-label MBS purchased by the Companies from 2005 to 2007. More recently, in 2017, FHFA reached a $5.5 billion settlement with the Royal Bank of Scotland. The entirety of the Companies' recoveries in these settlements has been paid to Treasury, even though the claims belonged to the Companies for wrongdoing and harm suffered before the conservatorship.

47.    In public statements and filings in related cases, the Government has claimed that the Third Amendment was implemented for the purpose of ending the "circularity" or "downward spiral" caused by the Companies' drawing on Treasury funding to pay dividends to Treasury, which in turn increased Treasury's stake. This is false. When it implemented the Third Amendment, the Government knew the Companies had returned to profitability and were projected to be able to pay the dividends owed to the Treasury without drawing on additional funds long into the future. Indeed, the Government imposed the Net Worth Sweep after the Companies disclosed that they had returned to stable profitability and had earned several billion dollars more than was necessary to pay the Treasury dividend in cash. The real motive behind the Third Amendment was the U.S. Government's desire to appropriate all of the economic rights from the Companies' private shareholders, to prevent those shareholders from receiving any money, to maximize the amount of money flowing into the U.S. Treasury, and to ensure that the Companies be wound

down and ultimately eliminated (or at least not permitted to return to private ownership). Again, whether the Government chooses to wind down the Companies or not is a separate question from whether the Government is permitted to appropriate all of the shareholder rights held by private shareholders, and to transfer those rights to the Treasury. There is nothing that permits the Government to do that – at least not without paying just compensation or appropriate damages to the private shareholders.

48.    In sum, since the implementation of the Third Amendment, the Government has expropriated "every dollar of earnings that each firm earns" on a quarterly basis, and will continue to do so forever (whether the Companies are wound down or not). This guarantees that there can never be a distribution to the holders of Common Stock, either as a dividend or in liquidation or in any other form, no matter how much income the Companies earn and no matter how much their assets are worth. The Third Amendment is clear: private shareholders cannot ever receive a dime; all of the economic shareholder rights previously owned by those shareholders are now held by Treasury, which gets absolutely all of the positive value generated by the Companies, no matter how many hundreds of billions in profit that means Treasury receives over and above what it has invested and what it would have received under the original PSPAs.

**F.    In December 2017, Treasury And FHFA Again Confirmed That The Net Worth Sweep Must Ensure That 100% Of All Value In The Companies Must Go To Treasury, No Matter How Large That Value May Be.**

49.    As originally formulated in the Third Amendment, the Net Worth Sweep required the entire net worth of the Companies to be paid to Treasury, minus a small reserve that would shrink gradually to zero by January 1, 2018. The intent was obvious: the Companies were to be wound down, and Treasury was to capture 100% of all the value.

50.    By December 2017, however, Treasury and FHFA apparently concluded they were not ready to liquidate the Companies just yet, or to operate them with literally zero

19

capital.  Accordingly, in December 2017, Treasury and FHFA agreed to prolong the existence of a $3 billion capital reserve while the Companies were in operation, so that the quarterly dividend is equal to the "Net Worth Amount" minus that $3 billion reserve.  Letter to M. Watt (Dec. 21, 2017) (*available at* goo.gl/hnPmKL).

51.     However, Treasury and FHFA also made sure that this capital reserve did not create any possible risk of any amount ever being available for distribution to private shareholders.  They expressly agreed that "the Liquidation Preference [i.e., the Liquidation Preference held by Treasury] shall be increased by $3,000,000,000.00." *Id.*  Thus, even the capital reserve has to be paid out to Treasury.  No matter what happens—no matter how much money or positive net value Fannie and Freddie make—there is *zero chance* that private shareholders can ever receive anything in a liquidation.

## II.   THE THIRD AMENDMENT IS INVALID BECAUSE IT IS THE CONSEQUENCE OF DECISIONS AND ACTIONS MADE BY AN UNCONSTITUTIONALLY STRUCTURED AGENCY AND UNCONSTITUTIONALLY APPOINTED OFFICER.

52.     This action, unlike some related actions, does not challenge whether the Third Amendment is an uncompensated taking, illegal exaction, or breach of contract and state-law duties owed to shareholders.  Nor does this action challenge whether FHFA's decision to place the Companies into conservatorship exceeded its statutory authority.

53.     The action challenges the Third Amendment on the basis that its execution and implementation is the consequence of decisions, actions, and policies carried out by an unconstitutionally structured independent agency, FHFA, whose Director was an unconstitutionally appointed officer at the time of the Third Amendment and throughout its implementation.

20

A.      **The FHFA Is Unconstitutionally Structured.**

54.     As explained above, FHFA is an independent agency.  Its director is removable only "for cause by the President." 12 U.S.C. § 4512(b)(2). Moreover, further insulating the director from presidential control, HERA provides that the director's actions as conservator "shall not be subject to the direction or supervision of any other agency of the United States." *Id.* § 4617(a)(7). FHFA also is not required to obtain appropriations for its expenditures, as funds it obtains through assessments are "not . . . construed to be Government or public funds or appropriated money." *Id.* § 4516(f)(2).

55.     FHFA is also structured in a manner that, at the time it was created, was entirely unprecedented in the Nation's history: it was and is led by a single individual rather than a multi-member board or commission.  This makes FHFA's structure unconstitutional. Independent agencies historically have had multi-member leadership as an offset for the political accountability lost by taking the agency out of the direct control of the President, a politically accountable constitutional officer.  The multi-member structure guards against arbitrary decision making and protects individual liberty by preventing one person from having complete control of the substantial powers of a federal agency.  The structure also forces the leadership to account for multiple viewpoints, adopt compromises that result in less extreme decisions, and better resist capture by interest groups.  The absence of multi-member leadership has resulted in decisions that do not enjoy the benefits of such a leadership structure and has resulted in FHFA undertaking a series of actions that significantly harmed the Companies' private shareholders.

56.     FHFA's single-member structure also has diminished the President's influence over the agency's decisions relative to a multi-member leadership structure.  Multi-member boards and commissions are often filled with individuals that are serving staggered terms and a chairperson designated by the President, both of which enable the President to influence the

agency's actions. Many multi-member boards and commissions are also required to be bi-partisan, ensuring that at least some members will be filled with persons belonging to the President's political party. FHFA's director, however, serves a five-year term and may remain in office indefinitely if the Senate fails to confirm a successor. 12 U.S.C. § 4512(b)(2), (4). Consequently, an FHFA director could be in office for the entirety of a President's four-year term, pursuing policies at odds with the President's objectives.

57.     Two years after HERA established FHFA, Congress created the Consumer Financial Protection Bureau ("CFPB"), which is also an independent agency headed by a single Director. The Executive Branch has taken the position that the CFPB's structure violates constitutional separation of powers requirements.

**B.      HERA Provides No Intelligible Principle That Guides FHFA's Conservatorship Powers.**

58.     HERA provides FHFA "general and regulatory authority" over the Companies, 12 U.S.C. § 4511(b)(2); 12 U.S.C. § 4501 note, and authorizes it to place the Companies into conservatorship under certain specified conditions. *See* 12 U.S.C. § 4617. While HERA provides FHFA a list powers it "may" exercise as conservator, FHFA's interpretation of those powers, if correct, would mean that the statute provides no principle for determining when and how it should exercise its "general and regulatory authority."

59.     FHFA has successfully argued to other courts that its powers are "extraordinarily broad." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 606 (D.C. Cir. 2017). Indeed, FHFA has consistently taken the position that as conservator it has "plenary operational authority," Final Opening Brief of Appellees FHFA, Watt, Fannie, and Freddie at 11, *Perry Capital LLC v. Lew,* No. 14-5243 (D.C. Cir. Mar. 7, 2016), and may "operate Fannie and Freddie as it sees fit," FHFA Memorandum in Supp. of Mot. to Dismiss at 15, *Collins v. FHFA,* No. 16-

cv-3113 (S.D Tex. Jan. 9, 2017), ECF No. 24 (quotation marks omitted), *i.e.*, without regard for any intelligible principle whatsoever.

60.     Under FHFA's interpretation of HERA, the statute not only gives the conservator sweeping operational authority over the Companies and unbounded discretion to dispose of their assets but also provides that as conservator FHFA "immediately succeed[s] to . . . all rights, titles, powers, and privileges of . . . any stockholder" in the Companies.   12 U.S.C. § 4617(b)(2)(A). With limited exceptions, courts have interpreted this language as making FHFA the successor to derivative claims that shareholders could otherwise file on the Companies' behalf, *Perry Capital*, 864 F.3d at 623-25, including, but not limited to, derivative claims against FHFA.  This provision also makes FHFA the successor to shareholders' rights to inspect the Companies' books and records, *Pagliara v. Federal Home Loan Mortg. Corp.*, 203 F. Supp. 3d 678, 685 (E.D. Va. 2016). Thus, under FHFA's interpretation of HERA, FHFA as conservator controls the Companies and all the rights of their private shareholders, including the right to bring claims on behalf of the Companies against itself.   As with its overall authority to manage the Companies, FHFA's interpretation of its statutory authority over shareholder rights does not include an intelligible principle to guide the conservator in its decisions about how to exercise these rights.

61.     HERA also says that FHFA "may" exercise the "incidental power" to "take any action authorized by this section, which the Agency determines is in the best interests of the regulated entity or the Agency." 12 U.S.C. 4617(b)(2)(J) (emphasis added).  FHFA understands this provision to allow it to use its conservatorship powers to advance its own interests when those interests conflict with the interests of the Companies and their shareholders. And since the statute does not say how FHFA should go about determining what is in its own interests, FHFA's

interpretation of this incidental power effectively empowers it to do anything it wants with the Companies and their assets.

62.     Further compounding the lack of an intelligible principle to guide FHFA's exercise of its discretion when it acts as conservator, HERA also severely restricts the availability of judicial review of FHFA's actions as conservator. Most significantly, HERA specifies that "no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator." 12 U.S.C. § 4617(f). A number of other provisions of HERA impose additional limitations on judicial review of FHFA's actions as conservator, receiver, or regulator. *See id.* § 4617(b)(2)(A)(i); *id.* § 4617(b)(5)(E); *id.* § 4617(b)(11)(D); *id.* § 4623(d). While none of these provisions bars constitutional claims like those raised in this suit, HERA's restrictions on judicial review further insulate FHFA from the mechanisms the Constitution creates to protect individual rights from arbitrary decisions by the federal government.

**C.     The FHFA's Director Was Unconstitutionally Appointed And Remained So At The Time The Third Amendment Was Executed.**

63.     When Congress created the FHFA, the director of its predecessor (OFHEO) became the director of FHFA. *See* 12 U.S.C. § 4512(b)(5). That director, Mr. Lockhart, was director when the Companies were forced into conservatorship and signed the original PSPAs. He resigned on August 5, 2009.

64.     Following Mr. Lockhart's resignation, he was not replaced with a Senate-confirmed official for over four years. When Mr. Lockhart resigned, he was replaced by an acting official. HERA provides that "[i]n the event of the . . . resignation . . . of the Director, the President shall designate" one of the FHFA's three Deputy Directors "to serve as acting Director until . . . the appointment of a successor" who is nominated by the President and confirmed by the Senate. 12 U.S.C. § 4512(f). These Deputy Directors are appointed by FHFA's Director. *Id.* § 4512(c)-

24

(e).  In accordance with these provisions, on August 25, 2009, President Obama designated Edward DeMarco to serve as FHFA's acting director.  Mr. DeMarco was appointed to his position by Mr. Lockhart.

65.     Acting heads of agencies are supposed to serve only temporarily.  Mr. DeMarco served for 52 months.  Indeed, President Obama did not nominate a replacement until 15 months after Mr. Lockhart resigned.  Following the Senate's rejection of the nomination on December 22, 2010, President Obama did not again nominate someone for the position for 29 months.  Congressman Melvin L. Watt was sworn in to replace Mr. DeMarco on January 6, 2014.

66.     Thus, between August 2009 and January 2014, Mr. DeMarco was FHFA's director.  Moreover, during the majority of this time, there was no one nominated to replace him.  It is rare for a "temporary" acting official to serve for even one year.

67.     During Mr. DeMarco's time as acting director, he was responsible for FHFA's change in approach regarding the Companies as their conservator.  Specifically, Mr. DeMarco changed FHFA's goal from rebuilding the Companies' capital and returning them to private control to winding down the Companies in a manner that guaranteed their shareholders would lose all the value of their investments.  This policy ultimately led to the imposition of the New Worth Sweep on August 17, 2012.

68.     During this time, Mr. DeMarco asserted the agency's independence.  He refused to approve the Obama Administration's proposal to reduce the principal on certain mortgages.  The administration nevertheless acknowledged it had limited ways to control the agency.  On August 3, 2012, HUD Secretary Shaun Donovan acknowledged that "some ha[d] called for [Mr. DeMarco] to be fired" but told reporters "[t]hat is not authority that the president

has." The Obama Administration reached that conclusion despite its desire for new leadership at FHFA. As early as October 2011, *Politico* reported that Mr. DeMarco had "resisted White House and Treasury Department pressure to step down."

69.     Mr. DeMarco himself acknowledged and made use of his independence. Responding to criticism from Obama Administration allies in 2011, Mr. DeMarco described himself as "an independent regulator" who was "not trying to be a friend or foe to anyone." And in March 2012, Mr. DeMarco stated that "the environment of the last number of months have shown substantial attempt to influence or direct an independent regulator."

## III.    CLASS ACTION ALLEGATIONS.

70.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the Rule 23 on behalf of: (i) a class consisting of all persons and entities who held common stock in Fannie Mae on August 17, 2012 and who were damaged thereby, and their successors in interest (meaning current shareholders) (the "Fannie Common Class"); and (ii) a class consisting of all persons and entities who held common stock in Freddie Mac on August 17, 2012 and who were damaged thereby, and their successors in interest (meaning current shareholders) (the "Freddie Common Class"). Excluded from both classes are the Defendants.

71.     The members of the Classes are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Classes. As of August 17, 2012, and the date of the filing of this action, there were hundreds of millions of shares of Fannie Mae and Freddie Mac Common Stock outstanding.

72.     Plaintiffs' claims are typical of the claims of the other members of the Classes, as all members of the Classes were similarly affected by Defendants' wrongful conduct that is complained of herein.

73.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes, and have retained counsel competent and experienced in class action, derivative, securities, and constitutional litigation.  Plaintiffs have no interests that are adverse or antagonistic to the Classes.

74.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

75.     Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

(a)     Whether the FHFA is an unconstitutionally structured independent agency;

(b)     Whether the FHFA director was unconstitutionally appointed at the time the Third Amendment was executed; and

(c)     Whether HERA unconstitutionally delegates authority to FHFA.

76.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

77.     Defendant has acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.

## COUNT I

## VIOLATION OF THE PRESIDENT'S CONSTITUTIONAL REMOVAL AUTHORITY AGAINST FHFA, AS REGULATOR AND CONSERVATOR, AND TREASURY

78.     The preceding paragraphs are incorporated herein by reference.

79.     Article II of the U.S. Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, cl. 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.  These provisions vest all executive power in the President and give the President constitutional authority to remove federal agency heads from office at will.  Although the Supreme Court has recognized an exception for certain independent agencies headed by expert, multi-member commissions, *see generally Humphrey's Executor v. United States*, 295 U.S. 602 (1935), that exception does not apply to FHFA.[1]

80.     Specifically, by vesting FHFA's leadership in a single director rather than a multi-member board and eliminating the President's power to remove the director at will, HERA violates the President's constitutional removal authority.

81.     This defect is exacerbated by the fact that FHFA has broad power over the housing sector in the United States, which represents over 15 percent of the Nation's Gross Domestic Product.  FHFA has used its conservatorship and regulatory authority in an effort to unilaterally reform this vast sector of the economy to the disadvantage of the Companies and their shareholders.

---

[1] Although a ruling in Plaintiffs' favor would be entirely consistent with Humphrey's Executor, Plaintiffs believe that the Supreme Court should overrule that decision.

82.     FHFA is subject to the Constitution's separation of powers when it acts as conservator, especially when it exercises its conservatorship powers to expropriate private property. Even if it is not, FHFA is still subject to the separation of powers when it acts as regulator. FHFA acted in its capacity as regulator when it forces the Companies into conservatorship, which made it possible for FHFA to later approve the Net Worth Sweep in its capacity as the Companies' conservator. The fact that FHFA was operating in violation of the separation of powers when it initially imposed the conservatorships infects its subsequent decision as conservator to agree to the Net Worth Sweep.

83.     Furthermore, during the entirety of the conservatorship, the Companies remain subject to oversight by FHFA as regulator, and FHFA as conservator would not and could not have agreed to the Net Worth Sweep or ordered the Companies to pay dividends without authorization from FHFA as regulator. *See* 12 C.F.R. § 1237.12(a), (b) (providing that "a regulated entity shall make no capital distribution while in conservatorship" except with authorization from "[t]he Director," *i.e.*, FHFA as regulator).

84.     The Net Worth Sweep visits new injuries on the Companies' private shareholders that they did not experience when the conservatorships were initially imposed. Only once the Third Amendment was implemented was it clear that FHFA's operation of the conservatorships would result in the total expropriation of private shareholders' investments. Furthermore, given FHFA's initial assurances that it would preserve and conserve the Companies' assets and rehabilitate them to a sound and solvent condition, the Companies' shareholders did not have adequate notice or incentive to contest the initial decision to impose the conservatorships in 2008.

29

85.     FHFA's expropriation of the Companies' resources and private shareholders' rights, and its pursuit of housing-financing policies that disadvantage the Companies and their shareholders, continue to harm Plaintiffs.  These ongoing injuries are being visited upon Plaintiffs as a result of both decisions by FHFA as conservator and decisions by FHFA as regulator.

86.     To remedy the violation of the Constitution's removal requirements, the Court should: (a) vacate the third amendment to the PSPAs; and (2) declare that henceforth FHFA is no longer an independent agency and strike down provisions of HERA that purport to make FHFA independent from the President, including 12 U.S.C. §§ 4511(a), 4512(b)(2), and 4617(a)(7).

## COUNT II

### VIOLATION OF THE SEPARATION OF POWERS
### AGAINST FHFA, AS REGULATOR AND CONSERVATOR, AND TREASURY

87.     The preceding paragraphs are incorporated herein by reference.

88.     Even if FHFA's single director does not violate the Constitution's removal requirements, the extent to which FHFA is insulated from control by any of the three branches of government violates the Constitution's structure and separation of powers.

89.     FHFA, as explained above, is heavily insulated from supervision and control by the President.  Congress likewise has no ability to direct or supervise the agency.  HERA exempts FHFA from the appropriations process by permitting FHFA to self-fund through fees it assesses on regulated entities that are not overseen by Congress.  *See* 12 U.S.C. § 4516(f)(2).  This exemption removes Congress's supervision and further weakens the President's ability to supervise FHFA because, by being able to fund itself, FHFA does not need the President's assistance in obtaining appropriations.

90.     HERA also forbids judicial review of a vast array of actions FHFA takes as regulator or conservator. *See* 12 U.S.C. §§ 4617(b)(2)(A)(i), (b)(5)(E); (b)(11)(D), (f); *id.* § 4623(d).  These restrictions often leave courts powerless to ensure that FHFA exercises its authorities in a lawful manner.

91.     The Constitution divides powers between branches to guard against the accumulation of power with any one person or group.  The Constitution, however, also is designed to ensure that the government remains accountable to the people.  FHFA violates this design by being structured in a manner that provides no branch of government meaningful direction or oversight of FHFA.

92.     To remedy this violation of the Constitution, this Court should: (1) vacate the third amendment to the PSPAs; and (2) declare henceforth FHFA is no longer an independent agency and strike down the provisions of HERA that make FHFA unaccountable to any of the three Branches of the federal government.

### COUNT III

### VIOLATION OF THE APPOINTMENTS CLAUSE
### AGAINST FHFA AS CONSERVATOR AND TREASURY

93.     The preceding paragraphs are incorporated herein by reference.

94.     The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all principal officers of the United States. U.S CONST. art. II, § 2, cl. 2.  As the head of an independent federal agency, the director of FHFA is a principal officer of the United States under the Appointments Clause.  The office thus can be filled only by someone nominated by the President and confirmed by the Senate.

95.     An inferior officer, who need not be nominated and confirmed, may *temporarily* assume the responsibilities of a principal officer.  The Appointments Clause, however,

limits the period during which someone who has not been nominated and confirmed can serve as an acting principal officer. The Recess Appointments Clause, which provides for the temporary filling of certain offices, limits the duration of those appoints to the end of the Senate's session. This is, at most, two years.

96.     Accordingly, serving as an acting principal officer for more than two years is unconstitutional.

97.     In addition, although Congress may by statute provide that, in the event of a vacancy, the occupant of a specific inferior office will by operation of law become an acting principal officer, the Constitution does not permit the President to appoint an acting principal officer. For the same reason, a principal officer may not appoint his acting successor by selecting from among multiple inferior officers. President Obama chose Mr. DeMarco from among three possible candidates to serve as FHFA's acting Director, all of whom were inferior FHFA officers selected by the outgoing Director. For this reason as well, Mr. DeMarco's appointment was unconstitutional.

98.     To remedy the violation of the Appointments Clause alleged in this Count, the Court should vacate the third amendment to the PSPAs.

### COUNT IV

### VIOLATION OF THE NONDELEGATION DOCTRINE
### AGAINST FHFA, AS CONSERVATOR, AND TREASURY

99.     The preceding paragraphs are incorporated herein by reference.

100.    Article I, Section 1 of the Constitution vests "[a]ll legislative Powers herein granted…in a Congress of the United States." Congress may not delegate any of its legislative powers to another branch of government. It violates this rule when it gives a federal agency discretion without articulating any intelligible principle to guide the exercise of that discretion.

101.    HERA, as interpreted by FHFA, does not provide any intelligible principle that informs the agency when and how to exercise any of the powers it has been given as a conservator for the Companies.

102.    Similarly, HERA provides that as conservator, FHFA "immediately succeed[s]" to "all rights, titles, powers, and privileges . . . of any stockholder . . . with respect to the regulated entity and the assets of the regulated entity." 12 U.S.C. § 4617(b)(2)(A).  Under this provision, during conservatorship FHFA has the exclusive authority to decide whether to exercise most shareholder rights, including the authority to decide whether most shareholder derivative suits may go forward.  Under FHFA's interpretation of HERA, nothing in the statute provides an intelligible principle to guide FHFA's discretion in the exercise of shareholder rights during conservatorship.

103.    FHFA abused its undirected discretion as conservator by imposing the Net Worth Sweep, which visited serious harm on the Companies' private shareholders.

104.    To remedy the violation of the nondelegation doctrine alleged in this Count, the Court should vacate the third amendment to the PSPAs.

## COUNT V

### VIOLATION OF THE PRIVATE NONDELEGATION DOCTRINE AGAINST FHFA, AS CONSERVATOR, AND TREASURY

105.    The preceding paragraphs are incorporated herein by reference.

106.    Plaintiffs allege in the alternative and solely for purposes of this Count that when FHFA acts as conservator it is a private entity and not the federal government.

107.    The Vesting Clauses award all Legislative power to Congress, U.S. CONST. art. I, § 1, all Executive power to the President, U.S. CONST. art. II, § 1, cl.1, and all Judicial power to the Supreme Court and any inferior federal courts established by Congress, U.S.

COST. art. III, § 1, cl.1.   Together, these provisions of the Constitution do not permit any delegation of Legislative, Executive, or Judicial power to a private entity.  *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *Printz v. United States*, 521 U.S. 898, 923 (1997).

108.   Delegations of Vesting Clause power to a private entity are *per se* unconstitutional because they invite the use of the federal government's sovereign powers to further private interests.  Far from guarding against such misuses of power, FHFA understands HERA to authorize it to do anything it "determines is in the best interests of . . . [FHFA]" when acting as conservator.   12 U.S.C. § 4617(b)(2)(J)(ii).   FHFA has specifically relied on this provision of HERA in defending the Net Worth Sweep, arguing that the harmful consequences for the Companies and their private shareholders do not matter because FHFA was authorized to act in its own best interests.

109.   Irrespective of whether FHFA's conservatorship powers are characterized as Legislative or Executive, HERA improperly gives Vesting Clause power to FHFA.   As conservator, FHFA has successfully argued that HERA grants it the power to ignore otherwise applicable state and federal law and to authorize violations of federal statutes by third parties. FHFA also has sweeping conservatorship powers over the Companies and their private shareholders—powers that FHFA claims it is free to exercise in a manner that is harmful to the interests of the Companies and their shareholders.  FHFA necessarily exercises either Legislative or Executive power when it: (i) displaces state and federal law; and (ii) makes decisions in a non-fiduciary capacity that are binding on the Companies and their shareholders.  FHFA did both of those things when it approved the Net Worth Sweep.

110.   To remedy the violation of the Constitution alleged in this Count, the Court should vacate the third amendment to the PSPAs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1. Vacating and setting aside the third amendment to the PSPAs, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

2. Enjoining Defendants and their officers, employees, and agents from implementing, applying, or taking any action pursuant to the third amendment to the PSPAs, including its provision sweeping all of the Companies' net worth to Treasury every quarter;

3. Enjoining Treasury and its officers, employees, and agents to return to Fannie and Freddie all dividend payments made pursuant to the Net Worth Sweep or, alternatively, recharacterizing such payments as a pay down of the liquidation preference and a corresponding redemption of Treasury's Government Stock rather than mere dividends;

4. Declaring that FHFA's structure violates the separation of powers, that FHFA may no longer operate as an independent agency, and striking down the provisions of HERA that purport to make FHFA independent from the President and unaccountable to any of the three Branches of the federal government, including 12 U.S.C. §§ 4511(a), 4512(b)(2), 4617(a)(7), and 4617(f);

5. Awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

6. Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,

Dated: August 16, 2018

**KESSLER TOPAZ MELTZER & CHECK, LLP**

By: _____

Eric L. Zagar, Esquire
P.A.  76596
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

*Counsel for Plaintiffs*

OF COUNSEL:

**BOIES SCHILLER FLEXNER LLP**
Hamish P.M. Hume
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com

**BOIES SCHILLER FLEXNER LLP**
Stacey K. Grigsby
Jonathan M. Shaw
James A. Kraehenbuehl
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
sgrigsby@bsfllp.com
jshaw@bsfllp.com
jkraehenbuehl@bsfllp.com

36